UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

**LEE A. JEFFREY**                                                                                          **PLAINTIFF**

**v.**                                                              **CIVIL ACTION NO. 3:10-CV-P357-H**

**CLARK TAYLOR et al.**                                                                              **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

Before the Court is the motion for summary judgment filed by Defendant Dr. Steven Shedlofsky (DN 35). For the following reasons, the Court will grant Defendant's motion.

### I. FACTS

In his complaint, Plaintiff Lee A. Jeffrey alleged that he is infected with the Hepatitis C virus (HCV) and that while he was incarcerated at the Luther Luckett Correctional Complex (LLCC), his virus was treated with a series of shots, which resulted in a severe adverse reaction. Specifically, he stated that on December 8, 2008, he was given a liver biopsy and an ultrasound, and that, on December 17, 2008, after the test results came back it was decided to give him HCV treatment via a series of shots per a 48-week plan consisting of weekly injections of 180 mg Pegasys and 600 mgs of Ribaspere twice daily. He stated that he began taking the shots on January 28 and that "as the week went on [he] instantly began having adverse reactions to the medicines." According to Plaintiff, first he experienced a series of rashes, chronic fatigue, and nausea, which he was told by the medical department was normal. He stated that on February 12, 2009, Defendant Shedlofsky, the Kentucky Department of Corrections (KDOC) Hepatologist, noted that Plaintiff had a very low absolute neutrophil count (ANC) that needed to be watched. Plaintiff further alleged that after a few weeks of treatment he became so weak that he could not make it to the medical department to obtain his daily insulin shots.

Plaintiff alleged that his complaints to the medical department about his reaction to the HCV medicine were either ignored or downplayed and that the doctors and nurses failed to properly monitor his treatment. He stated that due to the continuing treatment and his reactions thereto, he eventually had to be rushed to the hospital and undergo a life-saving blood transfusion. He alleged that he almost died due to Defendants' negligence and extreme indifference to his complaints. He named Warden Clark Taylor, Medical Provider Deb Williams, Hepatologist Shedlofsky, Medical Director Scott A. Haas, and Registered Nurse Eileen Brian as Defendants. He claimed that Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment and that Defendants were negligent under state law. On initial review, the Court allowed claims to go forward against several Defendants. Only the state-law negligence claims were allowed to go forward against Defendant Shedlofsky.

## II. ANALYSIS

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support an essential element of the nonmoving party's case for which he or she has the burden of proof. *Id.* Once the moving party demonstrates this lack of evidence, the burden passes to the nonmoving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *Id*. If the record taken as a whole could not lead the trier of fact to find for

the nonmoving party, the motion for summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Where the nonmoving party bears the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F. Supp. 214, 217 (E.D. Mich. 1990). The moving party, therefore, is "entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Id.* (internal quotation marks omitted).

Claims of negligent medical care fall under state law. In Kentucky, "[i]n a medical malpractice case, the plaintiff must prove that the treatment given was below the degree of care and skill expected of a reasonably competent practitioner and that the negligence proximately caused the injury or death." *Hyman & Armstrong, P.S.C. v. Gunderson*, 279 S.W.3d 93, 113 (Ky. 2008). Additionally, Kentucky law requires that negligence in medical cases must be established by expert testimony unless both negligence and the injurious results are so apparent that a layman with general knowledge would have no difficulty recognizing it. "It is an accepted principle that in most medical negligence cases, proof of causation requires the testimony of an expert witness because the nature of the inquiry is such that jurors are not competent to draw their own conclusions from the evidence without the aid of such expert testimony." *Baylis v. Lourdes Hosp., Inc.*, 805 S.W.2d 122, 124 (Ky. 1991) (footnote omitted).

Defendant Shedlofsky argues in his motion for summary judgment that Plaintiff cannot meet his burden of proof on the medical negligence claim against him.[1] He argues that Plaintiff must prove through expert testimony that the treatment rendered was below the degree of care and skill expected of a reasonably competent care provider and that the negligence alleged proximately caused the plaintiff damage.

In support of his summary-judgment motion, Defendant Shedlofsky attaches his affidavit, in which he avers that, while Plaintiff was receiving the Pegasys and ribavirin treatment, blood work was taken according to the treatment protocol. He avers that although Plaintiff's "initial, pretreatment or baseline blood sample was insufficient for analysis when it was drawn on January 28, 2009, the date his treatment was begun, it was redrawn on February 3, 2009." He further avers that on February 12, 2009, he noted that Plaintiff's ANC was low and recommended that it be monitored closely. He avers that March 26, 2009, labs revealed that Plaintiff's hemocrit had dropped to a very low level and that Plaintiff was seen on April 8, 2009, with symptoms of severe fatigue, dizziness, lightheadedness; Plaintiff was evaluated on several subsequent occasions and then daily from April 12 to April 18, 2009. However, Defendant Shedlofsky avers that he was not alerted regarding Plaintiff's condition from March 26 through April 18 until April 18.

Defendant Shedlofsky avers that on April 18, 2009, Plaintiff's hematocrit had dropped even lower and he was transferred to the hospital for treatment of anemia with blood

---

[1] Defendant Shedlofsky also argued that the claim against him is time-barred because under Kentucky law a malpractice claim against a physician must be brought within one year. In his response, Plaintiff argues that his claim is not time-barred because the one-year period was tolled while he exhausted his administrative remedies. Defendant Shedlofsky withdraws this argument in his reply brief.

transfusions.  He avers, "I was alerted to and learned of the complication of [Plaintiff's] therapy on April 18, 2009, and immediately instructed that [Plaintiff] no longer receive the Pegasys treatment."  He further avers that the transfusion occurred with no problems and that Plaintiff has since "made a complete and uneventful recovery from his anemia induced by the Pegasys and ribavirin treatment."

Defendant Shedlofsky avers that the therapy approved for Plaintiff and agreed to by him is FDA-approved, involving an injection of pegylated interferon once a week and oral ribavirin twice daily.  Because the treatment is difficult to tolerate and includes risks of serious complications, the algorithm to determine whether an inmate receives treatment includes evaluating whether the patient is healthy enough as well as the likelihood of the treatment's success.  Further, "inmates are informed of the potential side effects of the treatment and are asked to sign a consent form."

Defendant Shedlofsky also attached to his motion for summary judgment a form for "Consent for Hepatitis C Evaluation and Treatment" signed by Plaintiff on November 12, 2008.  That form stated in pertinent part:

> I understand that there are many side effects of receiving pegylated interferon and ribavirin.  The pegylated interferon . . . can cause fatigue, aching, headache, loss of appetite, weight loss, difficulty sleeping, anxiety, irritability, and depression which could be so severe that I might commit suicide.  Pegylated intereferon can also lower my white blood cells and platelets and also cause thyroid problems.  Ribavirin pills will be taken twice a day and this medication can cause breakdown of my red blood cells with a resulting anemia.  It can also cause a skin rash, itching, shortness of breath, cough, sore throat, nasal congestion, stomach pain and loss of appetite.  These side effects of pegylated interferon and ribavirin can be severe and can cause death.

Finally, Defendant Shedlofsky avers that, in his professional opinion, Plaintiff's medical care did

5

not breach the standard of care or cause any injury.

The medical records attached to the summary-judgment motion show that on October 23, 2008, Defendant Shedlofsky made the following progress note regarding Plaintiff:

> Inmate's Hep C genotype is 1a, as expected, and his last Alt was 92 giving a mean of 85. I am assuming his HIV is under good control (on Lexiva, Norvir, and Truvada), and that his CD4 count is >200 with undetectable HIV RNA. If this is the case, please have him sign a From #2 consent and proceed with the liver bx. Let me know the results when they are back.

Defendant Shedlofsky's January 25, 2009, Progress Note for Plaintiff states:

> Inmate's 12/8/08 liver bx at BHNE showed P3, L2, F3 histology, which qualifies him for antiviral Rx. Please inform inmate, get an initial quantitative HCV RNA and any other baseline labs and start his Rx with PegIFN weekly and ribavirin 600 bid. Please let me know exact start date and initial viral load.

The February 12, 2009, Progress Note states:

> Apparently inmate's HCV Rx was begun on 1/28. But the only quant RNA was from 2/3 with 23,626,000 IU/ml. What was his exact start date and was the quant RNA from "after" he was started on Rx, or was his start date after 2/3? In addition, it already looks like he'll have a very low ANC count if it was 0.8 after just one or two weeks of Rx. But for now, we'll just keep an eye on this.

An addendum to that progress note on that date from a nurse stated: "IM's quant was drawn prior to tx however lab corp called after IM started tx and stated that there was not enough blood to run test. Therefore labs had to be re done after IM started tx."

An April 18, 2009, Progress Note signed by Defendant Shedlofsky stated:

> Inmate's Hct dropped to 13.6 and he is being transferred to BHNE for transfusion of 4 units. I think it's clear that he will not tolerate HCV Rx with ribavirin and PegIFN. In addition to this severe anemia, he dropped his ANC pretty quickly too. Considering this is only his 12th week of Rx, I doubt he could make it 48 wks. His "initial" viral load was 23,626,000 IU/ml – but this was actually

> drawn a week AFTER his PegIFN/ribavirin was stated. He was
> supposed to have a repeat quant RNA drawn on 4/22. I would still
> get that lab next week.

On April 18, 2009, Plaintiff's symptoms had progressed to the point where Plaintiff was no longer able to walk, and he was sent to the emergency room. The transfer summary from attending physician Dr. Fred Kemen after Plaintiff's hospital stay at Baptist Hospital Northeast from April 18 to April 21, 2009, stated in pertinent part:

> The patient is a 49-year old black male inmate from [LLCC] who
> was started on Pegasys and ribavirin for his hepatitis C in late
> January of this year. For approximately ten days prior to his
> admission, he had dyspnea with exertion and fatigue with exertion.
> The symptoms have been progressive over the preceding ten days
> with them becoming disabling for three days prior to admission.
> He was seen twice by the treatment room nurse at [LLCC] on the
> evening of April 17, complaining of chest pain with dyspnea and
> weakness. On the last visit, the nurse was called to the dorm to
> evaluate him. He was brought up to medical after via a wheelchair
> as he was not able to walk to his dorm. He was treated for chest
> pain protocol, given nitroglycerin, aspirin and oxygen without any
> relief. He was then sent to the ER for further evaluation.
> Evaluation was done. He was found to have a hemoglobin of 5.0.
> He was admitted to the hospital for urgent transfusion.

The hospital records also note that Plaintiff received a transfusion of three units of packed red cells; that his pegasys and ribivarin were to be discontinued; that Plaintiff understood it was necessary to discontinue hepatitis C treatment permanently; and that his condition at discharge was satisfactory.

In response, Plaintiff argues that Defendant Shedlofsky did breach the standard of care, causing him injury. He also argues that the negligence of Defendant Shedlofsky is so apparent that a layperson with general knowledge would be able to recognize the resulting injuries and therefore no medical or expert testimony is necessary to prove Plaintiff's claim. Plaintiff points

to the fact that, since 2002, Defendant Shedlofsky has been the Director of the KDOC Hepatitis Management Program; that on January 25, 2009, Defendant Shedlofsky approved Plaintiff for the treatment; that approximately 18 days later, Defendant Shedlofsky noted that Plaintiff's ANC was low and recommended that it be monitored closely; and that on March 26, 2009, Plaintiff's hematocrit had dropped and he subsequently was transferred to the hospital for treatment of anemia with blood transfusions. He states that his lack of funds and incarcerated status should not be held against him in terms of his inability to obtain expert review of his case.

In reply, Defendant Shedlofsky argues that there are only two narrow exceptions to the requirement that a plaintiff must submit expert testimony and that neither exception applies here. First, he argues, the narrow exception in which any layman is competent to pass judgment from common experience that such things do not happen where there has been proper skill and care does not apply. Second, he argues that this is not a case of *res ipsa loquitor*, an example being where the doctor makes an admission from which one could infer that he acted negligently.

Here, Plaintiff's "claims of negligence were sufficient to avoid dismissal at initial screening, but he was required to present an expert opinion establishing medical malpractice in order to survive the motion for summary judgment." *Griffin v. Lappin*, Civil No. 10–49–GFVT, 2011 WL 2636859, at *3 (E.D. Ky. July 6, 2011) (citing *Alexander v. Crawford Radiology Clinic*, No. 2007-CA-000567-MR, 2008 WL 540906 (Ky. Ct. App. Feb. 29, 2008); *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982)). In *Griffin*, the court concluded that "because of Griffin's complex renal and urinary conditions, he could not rely on the "common knowledge exception" and that offering only his interpretation of his medical records and his own lay opinion was insufficient. *Id.* Similarly, here, the Court finds that the decision regarding the

necessity of HCV treatment weighed against that treatment's side effects and the decision as to when to discontinue treatment is too complex a question to fall within the "common knowledge" exception. Indeed, it is Defendant's averment that Plaintiff's medical care proceeded according to the protocol, did not breach the applicable standard of care, and did not cause injury. And, here, the record does not disclose any admission by Defendant Shedlofsky regarding negligence or from which negligence could be inferred such that the *res ipsa loquitor* exception would apply. Quite the opposite is true. Instead, this case falls squarely in the category of cases which by the complicated nature of the issues of medical causation and damages require expert testimony and not merely Plaintiff's lay opinion, which is all Plaintiff has offered.

### III. CONCLUSION AND ORDER

For the foregoing reasons, Defendant is entitled to judgment as a matter of law. Defendant's motion for summary judgment (DN 35) is **GRANTED**.

Date:



cc: Plaintiff, *pro se*
　　　Counsel of record
4412.009